UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DE'VON L. WALKER,

                Plaintiff,

v.                                             Case No. 16-cv-1485-pp

PAUL LUDVIGSON, *et al.*,

                Defendant.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 21) AND DISMISSING DEFENDANTS DEKEYSER, GERRITSON, TRITT, LUDVIGSON, WILLIAMS, BRADLEY AND SABISH**

---

I.     Procedural History

De'Von L. Walker is representing himself in this civil rights lawsuit. The court allowed him to proceed on claims that the defendants violated his Eighth Amendment rights by exhibiting deliberate indifference to the risk that he would harm himself. Dkt. No. 9. On May 11, 2018—nine months ago—the defendants filed for "partial" summary judgment, asking the court to grant judgment in favor of defendants Dekeyser, Gerritson, Tritt, Ludvigson, Williams, Bradley and Sabish. Dkt. No. 21. They did not mention defendant Moungey in motion, nor did they mention him in the conclusion paragraph of their brief (dkt. no. 22 at 30). In the body of the brief, however, they included a section arguing that there was no evidentiary basis for the plaintiff's claim that Moungey used excessive force. Dkt. No. 22 at 20-24. The defendants conceded that there were genuine disputes of material fact as to whether defendant DeYoung failed to treat the plaintiff's injuries after he harmed himself. Id. at 2.

In its November 22, 2017 scheduling order, the court required anyone opposing a summary judgment motion to file a response within thirty (30) days of service of the motion. Dkt. No. 14 at 1-2. Here, the defendants served the motion on May 11, 2018, so the plaintiff's response was due on Monday, June 11, 2018. The court did not receive a response from the plaintiff by that date. On July 9, 2018—about a month after the deadline—the court issued an order, stating that if the plaintiff wanted to respond to the defendants' motion, he had to file his response in time for the court to receive it by August 10, 2018. Dkt. No. 35. At the end of that order, the court told the plaintiff that if it did not receive his opposition brief, or his explanation for why he couldn't file an opposition brief, by the end of the day on August 10, 2018, the "court will conclude that he does not oppose the defendants' motion for summary judgment and will decide the motion without the plaintiff's input." Id. at 2.

On August 3, 2018, the court received a letter from the plaintiff. Dkt. No. 37. He explained that he was "suffering currently from a significant onset of symptoms of diagnosed mental illness." Id. at 1. He was at the Wisconsin Resource Center receiving treatment. Id. He said that because of his illness, he did not have the "mental fortitude" to be able to deal with the litigation; he explained that he'd had two psychotic episodes triggered by the simple act of reading the summary judgment documents. Id. at 1-2. He suggested that the court either dismiss his case without prejudice, allowing him to resume it when he felt capable of doing so, or that it appoint him an attorney, or that it mediate a settlement. Id. at 2.

The court responded by giving the plaintiff an additional sixty days to respond. Dkt. No. 37. The court declined to dismiss the case without prejudice, noting that since the time the plaintiff filed his complaint, the Wisconsin legislature had reduced the statute of limitations from six years to three, and that the events of which the plaintiff complained took place in November 2014. Id. at 2. The court declined to appoint counsel for the plaintiff because he had not demonstrated that he'd tried to find a lawyer on his own. Id. at 3-4. Finally, the court indicated that it would be happy to refer the case to mediation if both sides agreed, but it noted that even if the defendants agreed to participate in mediation, the mediating magistrate judge likely would want to make sure "that the plaintiff is sufficiently mentally and emotionally stable that he can participate meaningfully in mediation." Id. at 5. The court gave the plaintiff a deadline of February 15, 2019 by which to file his response to the motion for partial summary judgment. Id. at 6. It told the plaintiff that if he didn't file his response by that deadline, the court would consider whether to dismiss the case for failure to prosecute or to rule on the summary judgment motion without the plaintiff's input. Id.

It has been two weeks since the February 15, 2019 deadline passed, and the court has not received anything from the plaintiff. The Wisconsin inmate locator service shows that he remains at the Wisconsin Resource Center, where he has been since June 7, 2018. https://appsdoc.wi.gov/lop. The plaintiff has had eight and a half months to respond to the defendants' motion for partial summary judgment.

II.   Standard When a Party Has Not Opposed Facts

Federal Rule of Civil Procedure 56(e) says that if a party does not properly address another party's assertion of fact, the court may either give the party the opportunity to properly address the fact, consider the fact undisputed, grant summary judgment if the motion shows the movant is entitled to it or enter any other appropriate order. The court already has given the plaintiff more than one opportunity to properly address the defendants' proposed facts. Because he has not done so, the court will consider the defendants' proposed facts (dkt. no. 23) undisputed for the purposes of the motion. Fed. R. Civ. P. 56(e)(2).

III.  Undisputed Facts

Defendant DeYoung has not moved for summary judgment. While the defendants discussed their views of the plaintiff's claim against Moungey in their brief, they have not moved for summary judgment on his behalf. The court, therefore, will consider only whether the facts support a grant of summary judgment in favor of Dekeyser, Gerritson, Tritt, Ludvigson, Williams, Bradley and Sabish.

The undisputed facts indicate that Dekeyser was a correctional officer at Waupun Correctional during the relevant time. Dkt. No 23 at ¶2. Dekeyser was making his rounds at around 3:00 p.m. on November 5, 2014 when he saw that the plaintiff had painted his face with a white substance, and was "acting erratically." Id. at ¶3. He notified Gerritson—a correctional sergeant—then went on about his duties. Id. at ¶¶2, 4. Gerritson relayed Dekeyser's observations to

Tritt, who was a supervising officer. Id. at ¶¶2, 5. Tritt went to the plaintiff's cell, and found the plaintiff sitting on his sink, with "some type of white paint on his face, which he called 'war paint.'" Id. at ¶6. Ludvigson was a psychological associate at the prison, id. at ¶2; Tritt told Ludvigson what he'd seen at the plaintiff's cell, and asked Ludvigson to go talk with the plaintiff, id. at ¶7. Ludvigson went to the plaintiff's cell around 4:00 p.m. (an hour after Dekeyser first observed the plaintiff's odd behavior) and spoke with the plaintiff. Id. at ¶8. Ludvigson found the plaintiff "alert and oriented," and observed that he "kept appropriate eye contact." Id. at ¶10. The plaintiff's "thoughts were logical, organized and goal oriented and he reported no perceptual disturbances and did not appear to be attending to any internal stimuli." Id. The plaintiff denied to Ludvigson that he had any thoughts about harming himself or had any issues he wanted to talk about; when Ludvigson asked if the plaintiff was thinking of harming *other* people, the plaintiff responded, "[n]o more than usual." Id. at ¶11. Given the plaintiff's responses, Ludvigson decided not to place him in observation status, instead he planned to refer the plaintiff to his primary psych services clinician for a follow-up. Id. at ¶12. Ludvigson made this decision because the plaintiff denied that he was thinking of hurting himself, and while he said he was *thinking* of hurting others, he didn't report any plans to do so. Id. at ¶19.

About twenty minutes after talking with the plaintiff, Ludvigson emailed the prison clinical services group; he noted that the plaintiff was on "Dr. Johnston's caseload," and suggested that even though the plaintiff had said he

5

didn't want to meet with his doctor, someone might want to "touch base with [the plaintiff] the next day." Id. at ¶22. Five minutes later, another psych associate responded that if Dr. Johnston wasn't at Waupun the next day, that associate—Teresa McLaren—would check in on the plaintiff. Id. at ¶23.

Later that evening, Dekeyser was walking past the plaintiff's cell when the plaintiff stopped him and said, "[y]ou can tell your Sarg that I finally ate something." Id. at ¶30. Dekeyser asked the plaintiff what he'd eaten, and the plaintiff responded, "At least 30 Tylenol and a screw." Id. at ¶31. Dekeyser immediately contacted a sergeant by radio and reported this. Id. at ¶31. (As a correctional officer, Dekeyser has been trained not to go into an inmate's cell without other officers available to assist and maintain safety. Id. at ¶32.) Someone also notified Tritt about what the plaintiff had said, and he and the sergeant went to the front of the plaintiff's cell. Id. at ¶33. At this point, the plaintiff went to the back of his cell and tried to take more medication. Id. at ¶34. Tritt took out his Taser and told the plaintiff to come to the front of the cell to be restrained and taken out of the cell; the plaintiff did as instructed. Id. at ¶35. Dekeyser and another officer put the plaintiff's hands in restraints and took him to the restrictive housing unit for assessment by a nurse. Id. at ¶36. After the plaintiff had been assessed by the nurse, three RHU officers (including defendant Moungey) took the plaintiff to the RHU strip cell. Id. at ¶37.

Around 6:45 p.m., after Ludvigson had left for the day, the on-call psychological associate put the plaintiff on observation status, because he'd

6

reported to staff that he had swallowed 40 ibuprofen tablets and a couple of staples. Id. at ¶40.

The plaintiff has alleged that Moungey, Tritt and DeYoung used excessive force against him while he was in the strip cell. The defendants' facts show that DeYoung and Tritt did not arrive at the strip cell until after the alleged excessive force, id. at ¶¶55, 68-69, 71, 74. The evidence relating to excessive force implicates only Moungey.

Recall that McLaren had indicated that if Dr. Johnston wasn't around the day after this incident, McLaren would check in on the plaintiff. On November 6, 2014, McLaren attempted to review the plaintiff's observation, but she was told that he'd been taken to Waupun Memorial Hospital. Id. at ¶76. Upon the plaintiff's return to the prison, he was again placed in observational status. Id. at ¶77. He had "a mental health code of MH-1 and had a diagnosis of Posttraumatic stress disorder (PTSD), Obsessive-Compulsive Disorder (OCD), Social Phobia, and Antisocial Personality disorder . . . ." Id. at ¶78. The treatment plan was "to provide him with active listening and empathy, Cognitive Behavior Therapy (CBT) and dialectic techniques and provisions of materials to address relationships and anger reduction," and he was kept on clinical monitoring. Id. at ¶79.

Several days later, on November 10, 2014, Ludvigson met with the plaintiff around 10:00 a.m. "for evaluation and review of his observation placement from November 5th." Id. at ¶80. The plaintiff told Ludvigson that he'd swallowed the Tylenol and ibuprofen "because he was not happy with his

7

life;" he indicated that he'd swallowed the screw and the staples "as an afterthought." Id. at ¶81. Again, however, the plaintiff denied any thoughts of harming himself, and indicated that he was "open to" meeting with Dr. Johnston for a follow-up. Id. at ¶82. Ludvigson concluded that the plaintiff "did not appear to be a danger to himself at that time." Id. at ¶83. He released the plaintiff from observation status. Id. at ¶84.

Around 7:40 that evening, Williams was passing out bedtime medication; the plaintiff told Williams that he'd swallowed over sixty pills. Id. at ¶86. Williams immediately radioed for a supervisor to come to the cell to monitor the plaintiff. Id. at ¶87. Tritt and Bradley (a correctional sergeant) received those calls. Id. at ¶¶2, 88. Along with another officer, they responded to the plaintiff's cell, and Tritt told the plaintiff to come to the cell door and put his hands out to be restrained. Id. at ¶89. The plaintiff complied, the officers restrained him and Willams, Bradley and another officer took him to the Health Services Unit. Id. at ¶¶90-92. The nursing staff decided that the plaintiff needed to go to Waupun Memorial for evaluation. Id. at ¶93.

After the plaintiff returned to the prison, Ludvigson saw him on November 12. Id. at ¶96. The plaintiff told Ludvigson that when he was released from observation on November 10, he hadn't had any intention of harming himself. Once he got back to his cell, however, the medications with which he'd overdosed the first time were still there, "so he took them again." Id. Because the plaintiff had now tried to harm himself twice in quick succession, and had required hospitalization and monitoring, Ludvigson put him on

8

observation status. Id. at ¶97. McLaren released him from that status on November 13, 2014. Id. at ¶98. Ludvigson then met with the plaintiff, and set up a treatment plan for the plaintiff to be seen by psych services "routinely during clinical rounds, based on the clinical monitoring schedule, and at his request." Id. at ¶99. Staff also put the plaintiff "on a tether for medication precaution and health services wrote an order to control all of his medications, meaning unit staff would hold all of his medications on the medication cart and dispense the prescribed doses to him daily during the scheduled medications pass times." Id. at ¶100.

Williams wrote up a conduct report against the plaintiff for misuse of medications; Williams says he was directed by a supervising officer to do this. Id. at ¶94. On December 8, 2014, supervising officer Sabish conducted a disciplinary hearing on the report. Id. at ¶¶2, 101-102. The plaintiff was present at the hearing, admitted he'd had a suicide attempt on November 5, was returned from the outside hospital on November 8 and placed on observation, and said that no one knew what pills he'd taken. Id. at ¶103. The plaintiff had the opportunity to question Williams during the hearing. Id. at ¶104. Sabish concluded that the plaintiff had misused his medication, and gave him a disposition of twenty days loss of recreation. Id. at ¶106. The plaintiff appealed, and the warden reversed Sabish's decision and dismissed the conduct report. Id. at ¶¶110-111.

IV.   Analysis

Rule 56 says that the court "shall grant" summary judgment if the party moving for summary judgment shows that there is no "genuine dispute as to any material fact" and shows that the party moving for summary judgment "is entitled to judgment as a matter of law." As the court has noted, the above facts are undisputed, so the only question is whether those facts entitle Dekeyser, Gerritson, Tritt, Ludvigson, Williams, Bradley and Sabish to judgment as a matter of law.

   A.   *November 5, 2014 incident—Dekeyser, Gerritson and Tritt*

The plaintiff has alleged that Dekeyser, Gerritson and Tritt violated his Eighth Amendment rights on November 5, 2014 when they failed to prevent him from harming himself. A plaintiff alleging deliberate indifference must show he was at substantial risk of serious harm, and that the defendants were deliberately indifferent to that risk. Estate of Miller, *ex rel.* Bertram v. Tobiasz, 680 F.3d 984, 989 (7th Cir. 2012) (citing Sanville v. McCaughtry, 266 F.3d 724, 733 (7th Cir. 2001)). There is no question that "suicide is a serious harm." Id. (citations omitted). The question is whether Dekeyser, Gerrison and Tritt were deliberately indifferent to the risk that the plaintiff might harm himself. To show deliberate indifference, the plaintiff must show that "the [prison] official knows of and disregards an excessive risk to inmate health or safety; the officer must both be aware of facts from which to draw the inference that a substantial risk of serious harm exists, and he must also draw the inference." Id. (quoting Sanville, 266 F.3d at 734).

Dekeyser, Gerritson and Tritt were not deliberately indifferent to the risk that the plaintiff might harm himself—the facts show exactly the opposite. Dekeyser walked by and saw the plaintiff with his face painted white, acting strangely. Rather than ignoring it, he reported the strange behavior to Gerrison, who reported it to Tritt. Tritt went to the plaintiff's cell, and finds him sitting in the cell with his face painted white with "war paint." Rather than ignoring this, Tritt contacted a psychological associate, Ludvigson, and asked him to talk to the plaintiff. None of this was deliberately indifferent—all three defendants realized that something was not right and reported it, and Tritt made sure a medical professional knew about it.

Later that evening as Dekeyser was walking past the plaintiff's cell, the plaintiff told Dekeyser to tell his sergeant that the plaintiff had eaten something. Dekeyser asked what the plaintiff had eaten, and when the plaintiff responded that he'd swallowed a screw and at least thirty Tylenol, Dekeyser contacted a supervisor. That supervisor and Tritt went to the plaintiff's cell. When the plaintiff tried to take even more medication, Tritt ordered him to submit to restraints. Tritt and the supervisor restrained the plaintiff and took him to the RHU so that a nurse could see him. Again, none of this constituted deliberate indifference. The defendants took the plaintiff seriously, and acted immediately to get him help. Because the facts do not show that Dekeyser, Gerritson or Tritt were deliberately indifferent to the risk that the plaintiff might harm himself on November 5, 2014, the court will grant summary judgment in their favor.

B. *November 5, 2014 incident—Ludvigson*

Ludvigson showed up at the plaintiff's cell less than an hour after Dekeyser observed the plaintiff's odd behavior. He talked with the plaintiff, and found him alert and responsive. The plaintiff denied to Ludvigson that he had any intention of harming himself. Given that, Ludvigson decided not to put the plaintiff on observation, but he did email the psych services group and suggest that if Dr. Johnston was around the next day, she check on the plaintiff. McLaren responded to the email quickly, saying that if Johnston wasn't around the next day, McLaren would check on the plaintiff. It appears that Ludvigson had left work for the day by the time the plaintiff told Dekeyser that he'd swallowed the Tylenol and the screw; a different psych associate placed the plaintiff on observation status that night.

In his complaint, the plaintiff asserted that he told Ludvigson (and Dekeyser, Gerritson and Tritt) that he was suicidal. Dkt. No. 1 at 6-7. But he has not addressed their contentions that he did not, and the court has deemed the defendants' facts undisputed. The only question, then, is whether Ludvigson's decision not to place the plaintiff on observation, and to instead suggest that his doctor see him the next day, constituted deliberate indifference under the law. It did not. While Ludvigson had reason to believe that the plaintiff was acting strangely, he did not have reason to believe that the plaintiff was suicidal, because the plaintiff said that he wasn't. He made a medical decision not to put the plaintiff on observation. Even if that medical decision was wrong (and the court is not saying that it was), "neither medical

malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference." Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005). There is nothing in the record to show that Ludvigson's decision was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" the plaintiff's risk. Id. (quoting Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996)). The court will grant summary judgment as to Ludvigson relating to the November 5, 2014 incident.

    C.    *November 10, 2014 incident—Ludvigson*

On the morning of November 10, 2014, Ludvigson met with the plaintiff while the plaintiff was still in observation status, to discuss what had happened on November 5. The plaintiff told Ludvigson that he'd taken the pills—the Tylenol and the ibuprofen—because he was unhappy, and that he'd swallowed the screw and the staples "as an afterthought." As before, though, the plaintiff told Ludvigson that he wasn't thinking of harming himself at that point, and expressed a willingness to meet with his doctor for a follow-up. Because the plaintiff denied any intent to harm himself, Ludvigson removed him from observation status. Even if this decision was wrong (and again, the court is not holding that it was), that did not constitute deliberate indifference.[1]

Because the facts do not demonstrate that Ludvigson was deliberately indifferent to the plaintiff's risk of self-harm on November 10, 2014, the court will grant summary judgment in his favor.

---

[11] The plaintiff later confirmed to Ludvigson that at the time he'd been released from observation the on the morning of November 10, he hadn't meant to harm himself; it was only after he got back to his cell and saw the medications that he decided to take them.

13

D.   *November 10, 2014 incident—Williams, Tritt and Bradley*

On the evening of November 10, 2014, the plaintiff stopped Williams as Williams was passing out medications, and stated that he had swallowed over sixty pills. Williams immediately radioed supervisors for help; Tritt and Bradley appeared right away. As before, Tritt ordered the plaintiff to submit to restraints, and Williams, Bradley and another officer took the plaintiff straight to the HSU. These facts show the opposite of deliberate indifference—they show that the defendants took the plaintiff seriously, and responded quickly to his serious medical need.

E.   *Conduct report—Williams and Sabish*

In his complaint, the plaintiff alleged that Williams's "act of writing" the conduct report and Sabish's finding that he was guilty of misusing medication showed deliberate indifference to his "mental state," and caused him "supreme emotional as well as mental stress." Dkt. No. 1 at 11. The facts do not support this claim, nor does the law. The plaintiff's argument amounts to an assertion that the defendants should not have done anything to upset him, because he was emotionally and mentally vulnerable. To prove deliberate indifference, the plaintiff must show that the prison official acted with "'a sufficiently culpable state of mind,' something akin to recklessness." Giles v. Godinez, 914 F.3d 1040, 1049 (7th Cir. 2019) (quoting Arnett v. Webster, 658 F.3d 742, 751 (2011)). Williams and Sabish are not doctors, or medical professionals. There is no evidence that they would have reason to believe that filing a conduct report (Williams) or conducting a disciplinary hearing and making a finding of guilt

14

(Sabish) posed a serious risk to the plaintiff. Williams filed the conduct report at the instruction of a supervisor. These facts do not support a finding of deliberate indifference. The court will grant summary judgment in favor of Williams and Sabish.

V. Conclusion

The court **GRANTS** the defendants' motion for summary judgment as to defendants Dekeyser, Gerritson, Tritt, Ludvigson, Williams, Bradley and Sabish. Dkt. No. 21.

The court **ORDERS** that defendants Dekeyser, Gerritson, Tritt, Ludvigson, Williams, Bradley and Sabish are **DISMISSED**.

The court will issue a separate order, setting deadlines for the parties to advise the court regarding next steps (whether they wish the court to schedule mediation, or to set dates for a final pretrial conference and a trial, or consider some other option).

Dated in Milwaukee, Wisconsin this 4th day of March, 2019.

        **BY THE COURT:**

        _____
        **HON. PAMELA PEPPER**
        **United States District Judge**